UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERRY SCHMIDLI,

        Plaintiff,

v.                                                                    Case No. 08-12949
                                                                      Paul D. Borman
                                                                      United States District Judge

CITY OF FRASER, a Michigan Municipal
Corporation, FRASER CITY COUNCIL, FRASER
PUBLIC LIBRARY BOARD OF DIRECTORS,
JEFFREY A. BREMER, PAMELA J. LAVERS,
MOE GEROMETTE, WILLIAM A. MORELLI,
DAN ACCAVITTI, SANDRA M. CAOLIA,
BARBARA JENNINGS, JOHN A. SEXHAUER,
JANICE A.B. WILSON, LINDA CHAMPION,
DEE LARAMIE, MARY JEAN RICHTER, KEVIN
SAMOV and JOSEPH VENGALIL in their official
and individual capacities, Jointly and Severally,

        Defendants.

_____/

**ORDER (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
AND (2) DISMISSING THE ACTION**

On July 10, 2008, Defendants removed this case from the Macomb County Circuit Court

to this Court on the basis of federal question jurisdiction arising out of the Family and Medical

Leave Act ("FMLA"), 29 U.S.C. § 2611, *et seq.*, claim.  (Dkt. No. 1).  Sherry Schmidli

("Plaintiff") filed an Amended Complaint on January 21, 2010.  (Dkt. No. 34).  This Complaint

named the following as Defendants: the City of Fraser, Fraser City Council, Fraser Public

Library Board of Directors, Jeffrey A. Bremer, Pamela J. Lavers, Moe Geromette, William A.

Morelli, Dan Accavitti, Sandra M. Caolia, Barbara Jennings, John A. Sexhauer, Janice A.B.

1

Wilson, Linda Champion, Dee Laramie, Mary Jean Richter, Kevin Samov, and Joseph Vengalil (collectively, "Defendants").  Defendants filed an Answer to the Amended Complaint on February 9, 2010.  (Dkt. No. 35).

Plaintiff claims that she was wrongfully terminated from her position as the Director of the Fraser Public Library.  Specifically, Plaintiff makes the following claims:

> Count I: Violation of the Michigan Whistleblower Protection Act, Mich. Comp. Laws § 15.361, *et seq.*;
>
> Count II: Violations of the FMLA;
>
> Count III: Violation of the People with Disabilities Civil Rights Act;
>
> Count IV: Defamation;
>
> Count V: Gender discrimination in violation of the Michigan Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101, *et seq.*

On September 21, 2010, Defendants filed the instant Motion for Summary Judgment. (Dkt. No. 39).  Plaintiff was granted more time to file her Response, which she did file on December 3, 2010 (Dkt. No. 45).  Defendants replied on January 4, 2011 (Dkt. No. 46).  Oral argument was held on February 16, 2011.

For the reasons stated below, the Court will grant Defendants' Motion and dismiss all claims with prejudice.

## II.  BACKGROUND

Plaintiff was hired as the full-time Director of the Fraser Public Library in January 2005. Plaintiff's initial year as Director was, by all accounts, successful.  In a memorandum dated June 2, 2006, the City Manager, Defendant Jeffrey A. Bremer, described Plaintiff as "demonstrat[ing]

extensive professionalism in the Library."  (Pl.'s Resp. Ex. 4 - Performance Evaluation).

Defendant Bremer also stated that Plaintiff's "enthusiasm is infectious and drive is extremely

high."  *Id*.  Defendant Bremer further stated in his 2006 evaluation, "Overall your performance

has been excellent and your continued dedication is appreciated."  *Id*.  Defendant Bremer admits

that, overall, the use of the library and participation in library events increased during Plaintiff's

tenure, although this increase may be partly attributable to the closure of another nearby public

library:

> Q.  When Ms. Schmidli was the library director do you know if
> attendance or use of the library increased by the public, for
> example?
>
> A.  Oh, I believe that overall the attendance at the library
> increased, yes.
>
> Q.  And do you know if the resources were increased or better?
>
> A.  There was no formal report that was submitted annually
> relative to statistics. . . .  But it's clear from discussions with the
> current staff and it was clear from discussions with [Plaintiff] that,
> yes, the volume was up.  The materials that were being lent out
> were more.  The number of patrons utilizing the library were up in
> part because the Warren branch closed down.  But for the most
> part, yes, that's correct.  The participation and use was up.

(Defs.' Mot. Ex. E - Bremer Dep. at 56-57).

Subsequent to the 2006 evaluation, significant issues, discussed *infra*, arose with regard

the Plaintiff Schmidli's conduct.

**A.  Governance and Millage Issues**

At various times during her tenure as Director, Plaintiff expressed to Defendant Bremer

that she believed the Fraser Public Library was governed by the Fraser Public Library Board.

Plaintiff specifically noted her belief that her "boss" should be the Library Board, not Defendant

Bremer.  Defendant Bremer, on the other hand, believed that he was Plaintiff's immediate

supervisor and that she was required to report to him.

> A.  Well, what I recall is there was a complete insistence that she
> did not report to me, that the library board somehow and through
> some fashion was the absolute governing board to make decisions
> relative to all aspects of the library, insistently despite the fact that
> I answered her verbal question and told her that the library board
> did not have the authority that she suggested.

(Bremer Dep. at 47).

Plaintiff also expressed to Defendant Bremer her belief that a special library millage

previously passed by voters in 1963 was not being utilized within the library's budget.  One of

Defendant Bremer's responsibilities was to prepare a proposed city budget, including the budget

for the library.  (Bremer Dep. at 10-11).  Defendant Bremer provided his proposed budget to the

department heads in case they had "changes or modifications."  (Bremer Dep. at 11).  However,

Defendant Bremer never investigated or ordered an investigation of the governance or millage

issues beyond his own review of city council minutes.

Plaintiff did investigate these issues, specifically by submitting them for an independent

review by an attorney.  (Pl.'s Compl. Ex. 1 - Law, Weathers & Richardson Letter (herinafter, the

"Letter")).  The attorney's review indicated the following:

> Based on Act 164 [M.C.L. § 397.205], the Fraser Public Library
> Board has the "exclusive control" of the library fund, . . . and has
> the power to appoint the Library Director and library employees. .
> . .  However, due to the "exclusive control" that the Library Board
> exercises over the library fund under Section 5 of Act 164, the
> Attorney General has concluded that the City Council may not
> determine or modify the total amount of the library budget.  OAG
> No. 6924 (December 4, 2996).  Instead, the Library Board alone
> has the authority to determine the annual budget of the library.

(Letter at 4).  Regarding the millage issue, the attorney concluded that "[i]t could be argued that

4

the voter approved millage is still valid[,]" but that this could require some changes to the Library Board.  (Letter at 2).

## B.  Employee Complaints

Plaintiff attended a meeting in January 2007 in which concerns of various staff members were expressed.  Most of the Fraser Library staff attended this meeting.  (Defs.' Mot. Ex. D - Lavers Dep. at 50-51, 53).  The discussion at the meeting mainly involved the safety and welfare of the library employees (Lavers Dep. at 54), but there were also concerns with Plaintiff's management and behavior that were addressed at the 2007 meeting.

> Q.  What happened?  How did the meeting end?
>
> A.  The concerns were heard, we talked with Sherry and the union and all of us at the table ironed out the majority of the concerns, or at least attempted to, and made some changes and some we didn't make changes.
>
> Q.  Why did you make changes on some things and not on others?
>
> A.  Some of them was [sic] management rights of how we schedule and things of that nature and we explained them.  And I don't know, it's kind of hard to remember.  I don't remember all the specifics that was discussed.
>
> Q.  If it's a management rights issue, then that means the director has the right to make decisions in that area, correct?
>
> A.  Right.
>
> [. . . .]
>
> Q.  So at that time would it be accurate to say that you still thought Ms. Schmidli was an excellent employee?
>
> A.  Yes.  That was the start of them raising the issues.  That was the start of our concerns.  That started coming forward.

(Lavers Dep. at 54-55).

Around December 2007, various complaints about Plaintiff were presented to Defendant Lavers by the union steward.  These complaints described various strange and unprofessional behavior that Plaintiff had allegedly engaged in.  The staff complaints about Plaintiff included: (1) claims that she attempted to have professional conversations with library staff using a seal puppet, (2) that Plaintiff worked in front of library employees wearing a brassiere as a top garment, (3) that Plaintiff asked employees to spy on each other, (4) that Plaintiff discussed her sex life with library staff, and (5) that Plaintiff harassed, belittled and yelled at library employees.  (Defs.' Mot. Ex. I - Confidential Memo).

Although these complaints were submitted to the union steward, no grievances were ever filed against Plaintiff.  (Lavers Dep. at 87).  The complaints were also not signed by any library employees.  (Lavers Dep. at 46-47).  Still, Plaintiff was aware of the complaints and admitted that she expected her staff to file a grievance regarding her behavior as the Library Director as early as December 2007.  (Defs.' Mot. Ex. B - Schmidli Dep. at 125, 148-49).

Defendant Lavers testified that she investigated and verified these claims by talking to all but two of the library employees.  (Lavers Dep. at 47).  Defendant Lavers was unable to recall any dates for the incidents, or any details of her discussions with employees about the incidents, or any of Plaintiff's responses to the incidents.  (Lavers Dep. at 59-68).

On January 4, 2008, after Defendant Lavers' investigation, Plaintiff met with Defendants Lavers and Bremer.  (Lavers Dep. at 57).  At this meeting, Plaintiff and Defendants Lavers and Bremer addressed the complaints raised by the library staff.  As a result of this meeting, Defendants Lavers and Bremer instructed Plaintiff to take time off of work and to seek an evaluation by the Employee Assistance Center ("EAC").  (Lavers Dep. at 58; Bremer Dep. at

6

40).  Plaintiff refused to go to the EAC.  In her deposition, Plaintiff based this refusal on the fact

that she knew several people there and believed they "could not protect [her] confidentiality[.]"

(Schmidli Dep. at 158).  Plaintiff did not go elsewhere to seek counseling/assistance.  Instead,

Plaintiff decided to take a week vacation "to think about things[.]"  (Schmidli Dep. at 158).

## C.  FMLA Leave and Termination

On January 8, 2008, while on vacation, Plaintiff requested medical leave under the

FMLA.[1]  This was granted by Defendants.  Plaintiff thereafter requested and received an

additional 30 days of medical leave.  (Pl.'s Resp. Ex. 12 - FMLA Requests).  During this period

of time, Plaintiff contacted a law firm regarding the millage and governance issues she had

raised with the Fraser Public Library Board.  (Letter at 1).  Plaintiff also apparently consulted

with her current counsel during this period of time.

On February 27, 2008, Plaintiff informed Defendant Lavers that she would return to work

on March 4, 2008, and that she "would like to review [her] personnel file and any other papers

pertaining to [her] employment . . . that are maintained by the [a]dminstrative offices[.]" (Pl.'s

Mot. Ex. 16 - Return to Work Note).

At some point between February 27 and March 4, 2008, Defendant Lavers informed

Plaintiff that she needed to meet with Defendant Bremer and Defendant Lavers when she

returned to work on March 4.  (Schmidli Dep. at 183).  On the morning of March 4, 2008,

Plaintiff, accompanied by her attorney, reported to Fraser City Hall – not the Fraser Public

Library – to meet with Defendants Bremer and Lavers, who were accompanied by the city

---

[1]Plaintiff claims she suffers from a debilitating illness called Dysautonomia, which
causes her to have severe and often unpredictable reactions to certain chemical smells.  (Defs.'
Mot. Ex. B - Schmidli Dep. at 63-66).

attorney.  (Schmidli Dep. at 183; Lavers Dep. at 35; Bremer Dep. at 28-30).  At this meeting, Defendant Lavers told Plaintiff that she was being terminated as an at-will employee and handed her a termination notice signed by Defendants Bremer and Lavers.  (Defs.' Mot. Ex. K - Termination Notice).

## D. Dissemination of Employee Complaints

Because she was a Director, Plaintiff had a right to appeal her termination to the Fraser City Council.  On the day of her termination, Defendants Bremer and Lavers authored a "Confidential Memorandum" to the City Council and Mayor stating that Plaintiff had been terminated and discussing some of the library employees' complaints.  (Defs.' Ex. J - Confidential Memo).  Plaintiff's appeal to the City Council was denied.

The Confidential Memorandum to the City Council was subsequently disclosed pursuant to a Freedom of Information Act Request submitted by The Macomb Daily newspaper.  (Bremer Dep. at 87).  Accordingly, the complaints against Plaintiff were reported by the newspaper and disseminated online by at least two different websites.  (Pl.'s Ex. 18 - Web Page Printouts).

### III. STANDARD OF REVIEW

Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).  To survive this motion, Plaintiff must establish that there is a genuine issue of material fact that must be decided by a jury.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The Court construes all reasonable inferences in favor of the non-moving party.  *Id*. at 587.  However, Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id*. at 586.  The dispute over a material fact must be "'genuine,' that is, if the evidence is such that a reasonable juror could return a verdict

for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## IV.  ANALYSIS

### A.  Violation of the Michigan Whistleblower Protection Act

Plaintiff claims that she was discriminated against and eventually discharged because she was about to report suspected violations of law – specifically, that Defendant Bremer had illegally usurped the power of the Fraser Library Board.  (Compl. ¶¶ 73-74).

Michigan's Whistleblower Protection Act ("WPA") states:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee . . . reports or is about to report, verbally or in writing, a violation or suspected violation of a law or regulation or rule promulgated pursuant to the law of this state . . ., unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Mich. Comp. Laws § 15.362.  A claim under Michigan's WPA requires Plaintiff to show three elements: "(1) she was engaged in protected activity as defined by the Act; (2) the defendant discharged her, and (3) a causal connection exists between the protected activity and the discharge."  *Cooney v. Bob Evans Farms, Inc.*, 645 F. Supp. 2d 620, 628 (E.D. Mich. 2009) (citing *Shallal v. Catholic Soc. Servs. of Wayne County*, 455 Mich. 604, 610 (1997)).  These claims "are analyzed under the burden-shifting framework utilized in retaliatory discharge actions under Title VII."  *Id.* (citing *Taylor v. Modern Engineering, Inc.*, 252 Mich. App. 655, 662 (2002)).  First, Plaintiff has the burden of showing a prima facie case of retaliatory discharge.  *Roulston v. Tendercare (Michigan), Inc.*, 239 Mich. App. 270, 280 (2000).  Once a prima facie case is established, "the burden shifts to Defendants to articulate a legitimate

business reason for the discharge." *Id.* at 281. "If the defendant produces evidence establishing the existence of a legitimate business reason for the discharge, the plaintiff must have an opportunity to prove that the legitimate reason offered by the defendant was not the true reason, but was only a pretext for the discharge." *Id.*

Defendants argue that Plaintiff has failed to establish a prima facie case of retaliatory discharge because she has not established that she was about to report a suspected violation of Michigan law.

For an about-to-report claim, Plaintiff bears the burden of showing "by clear and convincing evidence" that she engaged in the protected activity. Mich. Comp. Laws § 15.363(4) (*see also Shallal*, 455 Mich. at 611). Plaintiff must show that (1) she was about to report, either verbally or in writing, a violation of law to a public body, and (2) that the person who fired her was objectively aware of the fact that she was about to report the suspected violation. *Cooney*, 645 F. Supp. 2d at 629. In interpreting the words "about to report," the Michigan Supreme Court has noted "that the language of the [WPA] intentionally reduces employee protection the more removed the employee is from reporting to a public body." *Shallal*, 455 Mich. at 613. The *Shallal* Court noted the legislative history of the WPA, which cautioned against the possibility of employees bringing "false claims of discrimination" based on the "about to report" language. *Id.*

The majority opinion in *Shallal* held that the plaintiff's WPA claim should survive summary judgment. *Id.* at 615. In that case, the plaintiff was an employee of Catholic Social Services ("CSS"), and testified at her deposition that she told the President of CSS, who was allegedly abusing alcohol at work, that he should "straighten up," and if he did not she would "report [him] to the department, to the board, anybody, everybody." *Id.* at 613-14. The Court

10

also noted that the plaintiff had taken several preparative measures, like noting specific dates

when the confrontations occurred.  *Id*. at 614.

In the instant case, Plaintiff has presented evidence that she compiled documents

detailing the suspected violation of law.

> A. . . . I believe – now, this is from my recollection, I had put
> together a thick binder that had historical documents in it that
> talked about everything from the millage being passed, it showed
> old budgets that had been done where the library actually received
> [the millage] . . .

(Schmidli Dep. at 117).  Plaintiff had presented all of these documents to Defendant Bremer

(Schmidli Dep. at 117-18), who had refused to investigate further.  (Bremer Dep. at 47-48).

Plaintiff claims that Defendant Bremer threatened to remove funding for the library, which

would result in its "demise," but that he never directly threatened her job.  (Schmidli Dep. at

112).  Plaintiff testified that, in her mind, she concluded that Mr. Bremer's body language

evidenced anger:

> Q      So at this second meeting did he ever say that if you
>        continue to pursue these issues that you would be fired?
>
> A      No. No.
>
> Q      Was there any yelling at this meeting?
>
> A      No, not that I recall, no.
>
> Q      Okay.  Did he seem angry in your opinion at this meeting?
>
> A      Angry when I – when he asked me who – who I thought
>        my boss was.
>
> Q      And you said that –
>
> A      Body language.  I'm [sic] public speaker.  I'm trained in
>        reading body language, it's what we do when we speak.

11

(Schmidli Dep. at 121).

At the meeting on January 4, 2008, Plaintiff requested that she and Defendant Bremer meet with the city attorney to discuss the millage issue, stating: "it needed to be straightened out because it's my signature that goes on the state aid report testifying to things."  (Schmidli Dep. at 157).  But Plaintiff did not at any point say that she intended to report Bremer or the City to any public body.

Plaintiff has not produced evidence that she directly threatened reporting the violations to a public body.  Plaintiff argues that she had actually contacted the Library of Michigan prior to her discharge, but it is clear that these contacts were merely to gather additional information about library funding in Michigan, not to report violations.  (Schmidli Dep. at 118-19, 230-31). Further, Plaintiff's insistence regarding the governance and millage issue cannot substitute for an actual, objective threat.  "An employer's subjective fear of retaliation will not substitute for some form of notice of threatened action.  Instead, an employer is entitled to objective notice of a report or a threat to report by the whistleblower."  *Kaufman & Payton, P.C. v. Nikkila*, 200 Mich. App. 250, 257 (1993).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's WPA claim.

**B.  FMLA Claim**

Plaintiff alleges that Defendants violated the FMLA because they failed to restore her to her previous position and they intentionally retaliated against her for taking FMLA leave. (Compl. ¶¶ 82-83).  There are two distinct theories for recovery under the FMLA, and Plaintiff raises both.  *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006).

Under the entitlement or interference theory, a plaintiff must show: "(1) she was an

12

eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled." *Id*. The employee also must show that the employer's violation was harmful. *Id*. at 508. If dismissal would have occurred regardless of the employee's FMLA request, the employee is not entitled to relief. *Id*.

Under the retaliation theory, a plaintiff must show: "(1) she availed herself of a protected right under the FMLA by notifying [her employer] of her intent to take leave, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action." *Id*. Where, as in this case, there is no direct evidence of discrimination based on Plaintiff's taking FMLA leave, this theory utilizes the burden-shifting framework under Title VII, discussed *supra* at Part A. *See Hunter v. Valley View Local Schools*, 579 F.3d 688, 692 (6th Cir. 2009).

## 1. Entitlement Theory

Plaintiff argues that "Defendants' failure to restore Schmidli to her job is a per se interference with her rights under the FMLA and a clear violation of that statute." (Pl.'s Resp. at 13). Under the entitlement theory, "[i]f the employee cannot show that he was discharged because he took leave – or at least that his taking leave was a 'negative factor' in the employer's decision to discharge him – he cannot show a violation of the FMLA." *Pharakhone v. Nissan North America, Inc.*, 324 F.3d 405, 408 (6th Cir. 2003).

Plaintiff alleges evidence that she claims supports her claim that taking FMLA leave could have been a "negative factor" in her discharge. While Plaintiff was on medical leave,

Defendants appointed Jean Slivka as the part-time Library Director. (Lavers Dep. at 9-10). Ms. Slivka does not receive any benefits. (Lavers Dep. at 9). After Plaintiff's discharge, Ms. Slivka became the permanent part-time Library Director. (Lavers Dep. at 12). Plaintiff claims that based on these facts, a reasonable juror could conclude that, as a result of Plaintiff's taking FMLA leave, Defendants decided the library did not require a full-time Director, and that Plaintiff was terminated as a result. *See Wysong v. Dow Chemical Co.*, 503 F.3d 441, 447 (6th Cir. 2007) (holding that "If an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled."). But Plaintiff's argument does not track so as to amount to a logical claim. First, if a director is on leave, the entity must designate an acting or part-time director. Second, appointing an interim director does not require the appointing authority to provide the same benefits; indeed, if it did, then the on-leave employee could contend that the position was filled on a permanent basis while she was on FMLA leave.

Defendants have produced evidence that Defendants Lavers and Bremer had a legitimate reason to terminate Plaintiff unrelated to her exercise of her FMLA rights. Defendants have shown that library staff had filed numerous complaints against Plaintiff, which involved highly questionable behavior for a library director. "[I]nterference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Edgar*, 443 F.3d at 508. Accordingly, Plaintiff's interference claim must be dismissed.

**2. Retaliation Theory**

Plaintiff has established a prima facie case of retaliation because she has shown that (1)

14

she availed herself of her statutory right to FMLA leave, (2) she was adversely affected by an employment decision when she was discharged, and (3) the proximity in time of the adverse employment decision and Plaintiff's FMLA leave constitutes indirect evidence of a causal connection between the two. *Skrjanc v. Great Lakes Power Service, Co.*, 272 F.3d 309, 314 (6th Cir. 2001). Defendants have, in turn, brought forth evidence of a legitimate, nondiscriminatory reason for Plaintiff's terminiation – namely, the employee complaints. Thus, the burden shifts back to Plaintiff to show that Defendants' stated reason for termination is a mere pretext. *Bryson v. Regis Corp.*, 498 F.3d 561, 572 (6th Cir. 2007). "At the pretext stage, [the Court] consider[s] whether [Plaintiff's] adduced evidence would enable a factfinder to conclude that [Defendants'] stated reason for terminating her is not the true reason and is simply a pretext for unlawful retaliation." *Id.*

"To meet her burden on pretext, the plaintiff must produce evidence sufficient that a reasonable finder of fact could reject the employer's proffered reason." *Michael v. Caterpillar Financial Servs. Corp.*, 496 F.3d 584, 597 (6th Cir. 2007) (punctuation omitted) (quoting *Haughton v. Orchid Automation*, 206 Fed. Appx. 524, 531 (6th Cir. 2006)). Plaintiff can show that Defendants' proffered reason is pretextual by submitting evidence demonstrating that it: "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* (quoting *Hopson v. DaimlerChrylser Corp.*, 306 F.3d 427, 434 (6th Cir. 2002)).

Plaintiff argues that Defendants' actual reason for terminating her was because they realized the library could be run under a part-time library Director. Plaintiff asserts that Defendants came to this realization as a result of her taking FMLA leave, at which time Jean

15

Slivka took over as the part-time Director. (Lavers Dep. at 9). As evidence, Plaintiff points out that Defendants have still not hired a full time Library Director, and that Ms. Slivka has been appointed the "permanent part-time library director." (Lavers Dep. at 11-12). Plaintiff also asserts that Defendants' reason for termination is pretextual because Defendants initially said she was being terminated as an at-will employee, and later stated that the employee complaints were a consideration in Plaintiff's termination. (Lavers Dep. at 32, 36-38).

Even taking this evidence in a light most favorable to Plaintiff, at best it demonstrates only "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). As the Sixth Circuit recently held in an unpublished decision, "plaintiff must show *both* that the reason was false, *and that* discrimination or retaliation was the real reason [for the adverse employment action]." *Baker v. Windsor Republic Doors*, Nos. 08-6200, 09-5722, 09-6553, 2011 WL 805768 (6th Cir. Mar. 8, 2011) (citation and punctuation omitted). Given the multitude of employee complaints about Plaintiff, her unprofessional behavior as the Library Director, and her refusal to attend the EAC as requested by Defendants Bremer and Lavers, Plaintiff's evidence of pretext is not plausible, and a fair-minded juror could not find in her favor. *See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989). Accordingly, Plaintiff's FMLA claim must be dismissed.

## C. People with Disabilities Civil Rights Act Claim

Plaintiff claims that Defendants terminated her in violation of the People with Disabilities Civil Rights Act ("PWDCRA"). Plaintiff alleges that Defendants perceived that she had a mental disability because they required Plaintiff to report to EAC for therapy.

The PWDCRA prohibits employers from "[d]ischarg[ing] or otherwise discriminat[ing]

16

against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability . . . that is unrelated to the individual's ability to perform the duties of a particular job or position."  Mich. Comp. Laws § 37.1202(1)(b).  The Act defines "disability" as:

> (*i*) A determinable physical or mental characteristic of an individual, . . . if the characteristic:
>
> (A) . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.
>
> [. . . .]
>
> (*iii*) Being regarded as having a determinable physical or mental characteristic described in subparagraph (*I*).

Mich. Comp. Laws § 37.1103(d).

"To establish a prima facie case of discrimination under the statute, a plaintiff must show that (1) he is 'disabled' as defined by the statute, (2) the disability is unrelated to the plaintiff's ability to perform the duties of a particular job, and (3) the plaintiff has been discriminated against in one of the ways set forth in the statute."  *Chiles v. Machine Shop, Inc.*, 238 Mich. App. 462, 473 (1999).

Plaintiff in the instant case does not argue that she was terminated because of an actual disability, and must therefore "prove that the employer *perceived* that the employee was actually 'disabled' within the meaning of the statute."  *Id*. at 475 (emphasis added).  In perceived disability cases, a plaintiff must prove the following:

> (1) the plaintiff was regarded as having a determinable physical or

> mental characteristic; (2) the perceived characteristic was regarded
> as substantially limiting one or more of the plaintiff's major life
> activities; and (3) the perceived characteristic was regarded as
> being unrelated either to the plaintiff's ability to perform the duties
> of a particular job or position or to the plaintiff's qualification for
> promotion.

*Michalski v. Bar Levav*, 463 Mich. 723, 732 (2001); *see also Hawkins v. Genesys Health*

*Systems*, 704 F. Supp. 2d 688, 702 (E.D. Mich. 2010).

Plaintiff cannot show that Defendants perceived her to have a disability that was either

substantially limiting, or that affected her "major life activity" of working. "In determining

whether or not a listed impairment is 'substantial' the Court should consider: (1) the nature and

severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the

permanent or expected permanent or long-term effect." *Hawkins*, 704 F. Supp. 2d at 702 (citing

*Chiles*, 238 Mich. App. at 479). In the instant case, Plaintiff's only evidence of perceived

disability is that Defendants Bremer and Lavers required her to take a leave of absence and seek

counseling with EAC, apparently as a result of the employee complaints about her. Plaintiff

argues that this constitutes a perceived disability of mental illness. However, even viewing this

evidence in a light most favorable to Plaintiff, there is no indication the Defendants expected

Plaintiff's perceived mental illness to be permanent or to have any long-term effect. To the

contrary, Defendants' suggestion that Plaintiff seek counseling is evidence that her perceived

disability – questionable behavior at most – might be a temporary condition which could be

overcome with therapy treatment.

In addition, there is no evidence that Defendants believed Plaintiff's ability to work was

limited. In interpreting the "major life activity" of "working," Michigan courts have held that

"the inability to perform a *particular* job does not constitute a substantial limitation. Instead, the

18

impairment must significantly restrict an individual's ability to perform a wide range of jobs." *Chiles*, 238 Mich. App. at 478 (emphasis in original, citations omitted). At best, Defendants' requiring Plaintiff to take a leave of absence and seek counseling reflect their belief that Plaintiff was not properly performing the job of the Library Director.

Because a reasonable juror could not find that Plaintiff was discharged because of a perceived disability, her PWDCRA claim must be dismissed.

**D. Defamation Claim**

Plaintiff alleges that Defendants allowed the staff complaints about her to be published "with knowledge of the falsity of the statements or in reckless disregard of their truth or falsity." (Compl. ¶ 93). In Michigan, a libel claim requires Plaintiff to show four elements: "1) a false and defamatory statement concerning the plaintiff, 2) an unprivileged communication to a third party, 3) fault amounting to at least negligence on the part of the publisher, and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication." *Rouch v. Enquirer & News of Battle Creek Michigan*, 440 Mich. 238, 251 (1992). "As is evident by the first requirement of falsity, truth is a complete defense to a defamation action." *Andrews v. Prudential Securities, Inc.*, 160 F.3d 304, 308 (6th Cir. 1998).

Plaintiff's defamation claim fails because she has not shown that the allegedly defamatory statements were false; indeed, she has admitted that a majority of the statements are true.

Plaintiff admitted that she talked to her staff using a seal puppet she called "Oslow." (Schmidli Dep. at 154-55).

Plaintiff admitted that, while cleaning a room in a storage area with another employee,

she removed her sweater and worked while wearing only a bra above her waist.  (Schmidli Dep.

at 209-12).  The bra incident occurred in front of two co-workers, as testified to by one of the

complainants against her, Mary Ellen DeSantis, at her deposition:

> A    I was concerned about the one instance where she was
>       upstairs, we were getting ready for a program and when
>       another co-worker and I went upstairs, she had taken her
>       top off and she was just in her bra.  That concerned me.  I
>       thought it was erratic behavior.

(Defs.' Mot. Ex. H - DeSantis Dep. at 18).

> Q    When you [set up the room] together did Ms. Schmidli put
>       her shirt back on?
>
> A    No, she did not.
>
> Q    Did either of you tell her you would feel more comfortable
>       if she did.
>
> A    No, because we were amazed.

(DeSantis Dep. at 20).

Plaintiff admitted that, on at least one occasion, she discussed in detail her sex life with

another employee.  (Schmidli Dep. at 223-25).  Plaintiff's counsel, Francyne Stacey, disputed

this at the February 16, 2011, hearing, but the transcript supports the Court's conclusion:

> MS. STACEY:  . . . Talking about her sex life with employees, that
> is just not true.  It's not true.  Miss Schmidli didn't do it.  She
> might have talked about, you know, in passing conversations –
>
> THE COURT: In her deposition I think she said that she did talk to
> the lady about it.
>
> MS. STACEY: She didn't talk about her sex life.  That would be,
> you know, talking about what a person does in bed.  I think what
> she talked about –
>
> THE COURT: Well, no, that she was having relations.

20

[. . . .]

MS. STACEY: Well, your Honor, just – I really respectfully disagree.

THE COURT: Okay.

MS. STACEY: Because the – when you read the testimony, it basically says did you ever discuss who you were dating, and the answer is: oh, I'm sure I did.  Did the details include anything about your sex life?  Not that I'm aware of.

[. . . .]

THE COURT: Line 25: Did you ever specifically mention having sex in front of the staff?  Myrna asked questions.  Okay.  We're not going to go to his name.  And then conversation, she did ask me is he married, and I said yes.  Are you having sex with him and what does his wife think about it?  This is on page 224, 225.  And I answered both of them yes.

MS. STACEY: That is not, your Honor –

THE COURT: That's what she said right there.

MS. STACEY: I understand what she said, but that is not talking about your sex life.  When people look at that –

[. . . .]

THE COURT: That's your opinion.  If that isn't sex life, I don't know what is.

(Hr'g Tr. 29-31)

Plaintiff admitted that she knew her employee, Herminia Ford, was afraid of driving, and yet had Ms. Ford drive her from the library across town to Beaumont Hospital in Royal Oak because Plaintiff did not want to go to the local hospital, which is where the 911 call responder would have taken her.  (Schmidli Dep. at 216-18).  Ms. Ford only offered to drive Plaintiff across town to Beaumont Hospital after Plaintiff proclaimed she was very ill, but refused to call

21

911, and stated she had to go to Beaumont.  Plaintiff admits that on the way to Beaumont

Hospital she kept ordering Ms. Ford to drive faster despite the fact that Ms. Ford was "almost

terrified of the driving going on and of the route;" as they finally neared the cross-town hospital,

Plaintiff said "I'm feeling better, let's just go back to the library."  (Schmidli Dep. at 217).

Plaintiff described the episode as follows:

> Q       The day that [Ms. Ford] drove you to Beaumont did you
>         actually end up being admitted to Beaumont or going to the
>         ER?
>
> A       No. No.
>
> Q       Okay. Why not?
>
> A       We, we – we started to go there and she was driving and
>         she was driving like 15 miles an hour, people were darting
>         around us, honking their horns at us and I told her, I said –
>         I said, you know, I said we can go – the speed limit's 35,
>         you know, we can go a little faster and here, you know, oh,
>         well, I'm not used to driving in these areas at all, I'm not
>         used to this and then I realized she was really – I think
>         almost terrified of the driving going on and of the route.
>         She wasn't familiar with it and I didn't realize that and I
>         finally told her, I said, stop, there's a pharmacy.  I said stop
>         at the pharmacy and I said, will you go in and get Pepto
>         Bismol and she came out with that and even though I didn't
>         know if I would react to it I thought this is what I got to do
>         so I took a little sip because it had worked before when I
>         had been in the hospital at Mount Clemens General, when I
>         was having a simulated heart attack and I thought I'm
>         going to do this and got a little better, I had a little more
>         and we sat there for a while and I felt better, I was able to,
>         to make a decision, I was good enough, probably coming –
>         I would assume, a little bit out of the afib because all of a
>         sudden I started being more normal, more animated.  And I
>         told her, I said, why don't we just go back.  I said, I'm
>         feeling better, let's just go back to the library.
>                 Now, I don't know if I went from there to
>         emergency or – I don't, I don't recall at that – you know,
>         probably I was feeling much better.  Occasionally I have

22

slipped into afib and my heart even – I just slip out
normally, they haven't had to do anything.

(Schmidli Dep. at 217-18).

Ms. Ford described the episode as follows:

A     [. . .] And the traffic was getting heavy from medium, about
      medium, and she told me I had to drive faster and I said no.
      I said, "You know what?  South Macomb Hospital is only a
      mile from here on 12 Mile and Hoover.  Why don't I just
      take you there?  It's closer."  And she said, "No, I want to
      go to Beaumont Hospital."

             Then she told me to take 696.  I said, "I'm sorry, I
      don't drive on 696."  She asked me twice to do that.  I said,
      "No, I can't drive on 696."  So we took 13 Mile and then
      the traffic was medium and there was a car in front of me
      and she told me to blow my horn and I'm not used to
      driving that way and so just for her to be quiet, I just kind
      of beep, beep, did that to my horn and she said, "Not like
      that" and she pressed my horn, you know, like something
      like that to get the attention of the driver in front of us but
      the driver didn't move.

             So she told me to swerve to the right and she was
      signaling the driver to let us in because she was saying she
      was, I guess, not feeling well or something.  So we were
      able to swerve then and have to keep swerving until I was
      already in front of the cars and then before we got to
      Beaumont, I don't know exactly where we were, but we
      were probably getting close to Woodward, somewhere
      there, and she said, "You can go around now.  I feel better
      now."  I said, "What?"  I said, "Are you sure?"  I said, "We
      are close to the hospital now" and she said, "Yeah, I'm
      feeling better.  You can turn around and let's go back to the
      library."

             So I turned around and then I told her, I said, "You
      know, you should get a number for that other EMS
      ambulance so if you want to go to Beaumont, call that
      number and like you said, they'll take you to Beaumont
      instead of Mount Clemens" and she dialed 911 in my car.  I
      said, "What are you doing?"  She said, "I need that number
      to put in my cellular phone so I know it's there when I need
      it."  I said, "You don't call 911.  Why don't you wait until
      you get back to the library?"  [B]ut she called 911 anyway

23

> and asked for the number.
>           And then we got to the library and she just start
> [sic] laughing at me in front of the other employees
> because of the experience I had.  She said, "Poor Myrna."

(Defs.' Mot. Ex. F - Ford Dep. at 76-77).

These extensive quotes were placed in this opinion to clearly establish that Plaintiff had multiple issues that the city administrator was aware of, and that the city counsel had to be made aware of.

Plaintiff's defamation claim also fails because Plaintiff is a public official.  "To prevail in a defamation claim, a plaintiff who is considered to be a 'public official' or 'public figure' must prove that the defendant acted with 'actual malice' when publishing the alleged defamatory material."  *Williams v. Detroit Bd. of Educ.*, 523 F. Supp. 2d 602, 607-08 (E.D. Mich. 2007) (citing *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964)).  The Supreme Court has defined the "public official" designation as applying "to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility or control over the conduct of governmental affairs."  *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). Michigan courts have held that this designation can apply to non-elected government employees, such as a police lieutenant.  *Tomkiewicz v. Detroit News, Inc.*, 246 Mich. App. 662, 671 (2001). This District has also found that a public school principal can qualify as a public official. *Williams*, 523 F. Supp. 2d at 610.

The allegedly defamatory remarks in this case involve Plaintiff's conduct as the Director of the Fraser Public Library.  Plaintiff had the authority to administer the library budget, to implement library programs for the public, and to otherwise determine how the library could best serve the community.  Thus, Plaintiff had "substantial responsibility for or control over the

24

conduct" of the Fraser Public Library.  *Rosenblatt*, 383 U.S. at 85.  Accordingly, Plaintiff is a public official and must prove "actual malice" in her defamation claim.

Plaintiff has presented evidence that Defendants Lavers and Bremer authored and sent the March 4, 2008 memo to the Fraser City Council without confirming the dates of the incidents in question, without confirming in writing which specific employees voiced the complaints, and without confirming the details of the incidents.  (Lavers Dep. at 60-66).

However, when asked at her deposition whether she verified the employees' complaints, Lavers responded that she had: "Well, verification was them talking directly to me, all of them face-to-face.  I met with every one of our employees except maybe one or two; all the full-time, all the part time, a board member."  (Lavers Dep. at 47).  Plaintiff has not produced evidence of bad intent on behalf of any of the named Defendants.[2]  Therefore, viewing the evidence in a light most favorable to the Plaintiff, a reasonable juror would at best find that the Defendants were merely negligent.

To summarize, Plaintiff's defamation claim fails for two reasons: first, Plaintiff has admitted that most of the allegedly defamatory statements are true, and second, Plaintiff has not shown that Defendants acted with actual malice.  Accordingly, the defamation claim will be dismissed.

**E.  Gender Discrimination Claim under the Eliot-Larsen Civil Rights Act**

Plaintiff alleges that Defendants terminated her on the basis of her gender.  (Compl. ¶ 101).  Under Michigan's Eliot-Larsen Civil Rights Act ("ELCRA"), an employer may not

---

[2]Plaintiff argues that one library employee, Laura Vitek, intentionally published the allegedly defamatory accusations in e-mails to her sister.  However, Ms. Vitek is not a defendant in this case.

discriminate "on the basis of sex with respect to a term, condition, or privilege of employment." Mich. Comp. Laws § 37.2202(1)(c). Federal Title VII precedent is relevant when evaluating ELCRA claims on summary judgment. *Conti v. American Axle and Mfg., Inc.*, 326 Fed. Appx. 900 (6th Cir. 2009). Under the ELCRA, a claim of sex discrimination can be under either an intentional discrimination theory or disparate treatment theory. Plaintiff argues both theories.

The focus of Plaintiff's argument is that her predecessor as Director of the library, Eric Seuss, was not an effective Library Director, but he was never dismissed and was allowed to leave the library on his own terms. Plaintiff, by contrast, asserts that she was a much better Library Director, but she was terminated by Defendant Bremer.

## 1. Intentional Discrimination

"In order to establish a prima facie case of intentional sex discrimination a plaintiff must show that she was a member of a protected class, that she was discharged or otherwise discriminated against with respect to employment, that the defendant was predisposed to discriminate against persons in the class, and that the defendant acted upon that disposition when the employment decision was made." *Coleman-Nichols v. Tixon Corp.*, 203 Mich. App. 645, 651 (1994).

Plaintiff has failed to produce evidence of intentional discrimination. Specifically, Plaintiff has not produced any evidence that Defendant Bremer was predisposed to discriminate against her on the basis of her sex. Plaintiff's only evidence of intentional discrimination is her own testimony that she was "treated much more harshly than [her] male counterpart had been treated[.]" (Schmidli Dep. (Aug. 4, 2010) at 29). Taking this evidence in a light most favorable to Plaintiff, a reasonable juror could not find that this constitutes evidence that Defendant

26

Bremer was predisposed to discriminate against women, or that he terminated Plaintiff because she is a woman. *See Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (holding that plaintiff's "own subjective opinion" was "not sufficient to survive *any* motion for summary judgment[.]" (emphasis in original)).

## 2.  Disparate Treatment

Absent direct evidence, Plaintiff can prove sex discrimination by showing that she was treated differently than a similarly situated male employee. *Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007). "To show that she was treated differently than similarly situated males for the same or similar conduct, [Plaintiff] must show that 'all relevant aspects' of her employment situation are 'nearly identical' to those of the alleged similarly situated male employees." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004). Plaintiff must have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish [her] conduct or the employer's treatment of [her] for it." *Gray v. Toshiba American Consumer Products, Inc.*, 263 F.3d 595, 599 (6th Cir. 2001) (citation omitted).

Plaintiff argues that Eric Suess, the Library Director who preceded her, was treated more favorably. However, Plaintiff cannot show that Mr. Suess was similarly situated. Although Plaintiff and Mr. Suess held the same job position and title, Plaintiff amassed numerous employee complaints and exhibited strange behavior. Mr. Suess, on the other hand, had no employee complaints during his time as the Library Director. (Schmidli Dep. Pt. II at 44-45).

Because Plaintiff has not made a prima facie case of gender discrimination, her claim must be dismissed. *Humenny*, 390 F.3d at 906.

## V.  CONCLUSION

27

Defendants have set forth extensive factual evidence, not contradicted in relevant part, of both strange and improper conduct by Plaintiff with regard to her job performance.  Defendants' request that Plaintiff attend counseling/get assistance was rejected by Plaintiff.  Plaintiff sought and received FMLA leave.  During that period, Plaintiff did not inform Defendants of her willingness to enter the EAC program or get counseling on her own.  Thus, she was terminated from her at-will employment, in part, because she refused to address Defendants' legitimate concer ns of her management capabilities, given the multiple significant incidents of both strange and improper behavior that Defendants had confirmed while Plaintiff was employed as the Library Director.

For the reasons stated above, the Court will:

(1) **GRANT** Defendants' Motion as to all counts, and

(2) **DISMISS** all claims against the Defendants **WITH PREJUDICE**.

**SO ORDERED.**

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  March 22, 2011

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on March 22, 2011.

S/Denise Goodine
Case Manager

28